UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN BELL, individually and on behalf of all similarly situated individuals,<br><br>          Plaintiff,<br><br>    v.<br><br>BIMBO FOODS BAKERIES DISTRIBUTION, INC.,<br><br>       Defendant. | Case No. 11 C 03343<br><br>Judge Edmond E. Chang |

MEMORANDUM OPINION AND ORDER

Plaintiff Steven Bell has sued Bimbo Foods Bakeries Distribution, Inc. on behalf

of himself and a proposed class, alleging that Bimbo has violated the Illinois Wage

Payment and Collection Act (IWPCA), 820 ILCS 115/9 (Count Two), and breached the

terms of Bell's distributor agreement with Bimbo (Count Six). R. 36, Am. Compl. ¶¶ 2,

48-53, 81-84.[1] Bimbo has filed a motion for summary judgment on the merits [R. 74],

---

[1]This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Bell is a citizen of Illinois, and Bimbo is incorporated under the laws of Delaware, with its principal place of business in Pennsylvania. Am. Compl. ¶¶ 6-7. Bell alleges that there are more than 100 members in the proposed classes, *see* R. 105, Pl.'s Class Cert. Br. at 11, and that the amount in controversy, in the aggregate, exceeds $5,000,000, Am. Compl. ¶ 10.

    Citation to the docket is "R." followed by the entry number and, when necessary, the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Defendant's Statement of Facts) [R. 76]; PSOF (for Plaintiff's Statement of Facts) [R. 82].

    In his original complaint, Bell claimed that Bimbo failed to pay him overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* R. 1, Compl. ¶¶ 1, 41-49. Bell dropped this claim in his Amended Complaint. *See* R. 35, 1/6/12 Minute Entry. The parties then stipulated to dismissing with prejudice Bell's claim under the Illinois Minimum Wage

and Bell has filed a motion for class certification [R. 104]. For the reasons discussed below, the Court grants Bimbo's summary-judgment motion. In light of this holding, the formal ruling on the class-certification motion is that it is denied as moot. But for the sake of completeness, the Court explains how it would have ruled on that motion.[2]

## I. Background

In deciding Bimbo's summary-judgment motion, the Court views the evidence in the light most favorable to Bell, the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Steven Bell has worked as a distributor for Bimbo and its predecessor since 1992, selling and delivering Bimbo's bakery products to local retailers in his designated sales area. R. 76, DSOF ¶ 12. The distributor agreement that currently governs the parties' relationship classifies Bell as an independent contractor. *Id.* ¶¶ 14, 17; R. 76-2, Def.'s Exh. B, Distrib. Agreement § 6.2. But Bell disputes this classification and contends that he is actually a Bimbo employee. Am. Compl. ¶¶ 2, 4, 6.

Bell's distributor agreement with Bimbo contemplates that he will buy products from Bimbo at one price, sell them to a customer at a higher price, and make money

---

Law Act (Count One), as well as his rescission and unjust enrichment claims (Counts Three and Four). R. 73. Finally, the Court dismissed Bell's Illinois Franchise Disclosure Act claim (Count Five) in an earlier opinion, R. 91 at 2, 8-9, and therefore does not reconsider the arguments that the parties raise on this issue in their summary-judgment briefs now before the Court.

[2]Rule 23(c)(1)(A) instructs courts to decide the class-certification issue at "an early practicable time," which suggests that, usually, the certification decision should come before a decision on the merits. But the Court explained why in this case, under the reasoning of *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995), it is appropriate to decide the merits question before the certification decision. *See* R. 67.

on the difference. R. 82, PSOF ¶ 2; R. 82-1, Pl.'s Exh. 1, Bell Dep. at 73. Under the agreement, Bell remits the purchase price of all products that he buys from Bimbo into a "settlement account," less any credit for stale or damaged merchandise that he returns under Bimbo's return policy. Distrib. Agreement § 8.1. Bell has had customers who then pay him directly in cash for products, but these customers are rare. R. 94-1, Def.'s Exh. A, Bell Dep. at 352-53, 405. Instead, at Bell's request, Bimbo can purchase customers' charge slips from Bell by crediting Bell's settlement account. Distrib. Agreement § 8.2. Every week, Bimbo then pays Bell the amount in his settlement account, less certain deductions. PSOF ¶ 2.

Bell's IWPCA claim focuses solely on deductions from his settlement account for costs related to the handheld computer equipment that he purchased and maintains, as required under his distributor agreement. *Id.* ¶ 1; Distrib. Agreement § 4.1. In September 2000, Bell signed a document authorizing a weekly deduction of $56.88 for computer-related costs, including paper and supplies, maintenance, and a home polling charge. DSOF ¶ 45; PSOF ¶¶ 1, 3; R. 76-5, Def.'s Exh. E, Assignment of Receivables at BFBD000065. The authorization also states that the deductions would continue until September 13, 2003, or "until revoked in writing by [Bell]." Assignment of Receivables at BFBD000065. Bimbo provided Bell with year-end summaries showing that it made deductions from Bell's settlement account for various expenses, including for "Handheld Maintenance," "Handheld Supplies," "Communication Charge," and "Norand Paper & Ribbons." PSOF ¶ 4; R. 82-2, Pl.'s Exh. 2.

Bell also asserts three different breach-of-contract theories. The first of these theories concerns Bimbo's pricing and promotion practices. Bell's distributor agreement recognizes that certain chain stores in Bell's sales area "require that purchasing decisions be made through a central office, and will not negotiate with individual Distributors." Distrib. Agreement § 7.1. As a result, Bimbo is authorized "to negotiate and solicit business" on Bell's behalf and must "use its best efforts" to sell products to chain stores. *Id.* The agreement also specifies that Bell "may participate in and contribute to with [sic] BFBG and individually as appropriate to maximize opportunities for sales of the Products." *Id.* § 7.2.

Bell challenges Bimbo's practice of unilaterally negotiating with Bell's customers over product prices and promotions without inviting Bell to participate or seeking his approval. *See* PSOF ¶¶ 7, 11-12. He also takes issue with Bimbo's practice of requiring him to sell products to chain stores at lower promotional prices before a promotion has begun. *Id.* ¶¶ 7, 12. Along the same lines, Bell challenges Bimbo's requirement that he give chain stores full wholesale credit when they return stale products even when the stores purchased the products at a lower promotional price. *Id.* Bell explains that these practices significantly impact his ability to make money because approximately 95% of his business is with chain stores. R. 79, Bell Decl. ¶ 6; *see also* PSOF ¶ 9.[3]

[3]It is unclear what Bell means by this estimate. On the one hand, Bell's distributor agreement lists at least six chain stores that fall within his sales territory; thus, he could mean that 95% of his customers are chain stores. *See* Distrib. Agreement, Exh. A at BFBD000043. But he could also mean that 95% of his sales or profits come from chain stores. For example, in his statement of facts, he explains that "95 percent of all agreements involving pricing . . . are negotiated by BFBD." PSOF ¶ 9.

Second, Bell argues that Bimbo also breached its contract with him by denying him the exclusive right to sell Sara Lee bread products in his sales area. *See* PSOF ¶ 33. Bimbo's parent company acquired Sara Lee Corporation's North American bakery business in 2011. *Id.* ¶¶ 24, 28; DSOF ¶ 55. After this acquisition, Bell expected that he would acquire the rights to market and distribute Sara Lee bread products because, in the past, Bimbo and its predecessors had always given him the right to distribute products that would otherwise compete with the products in which he had purchased an equity interest. PSOF ¶¶ 30, 39. In 2010, however, Bell signed an amendment to his distributor agreement that changed the definition of the products he could distribute. *See* R. 76-4, Def.'s Exh. D, Am. Distrib. Agreement at BFBD000049. Under the amendment, "**[p]roducts do not include** . . . [p]roducts distributed . . . under any trademarks other than those listed above[: Arnold, Brownberry, and Bimbo.]" *Id.* In other words, the distributer agreement covers only those products trademarked as Arnold, Brownberry, and Bimbo. But at the time he signed the document, Bell believed that the amendment merely allowed him "to handle the Bimbo." PSOF ¶ 37 (internal quotation mark and citation omitted).

Bell's final breach-of-contract claim challenges Bimbo's stale return policy. Bell's distributor agreement gives him the option of returning unsold, stale, or damaged products to Bimbo for full return credit. Distrib. Agreement § 3.4; *see also* DSOF ¶¶ 20-21. The agreement also permits Bimbo to amend its stale return policy. Distrib. Agreement § 3.4 ("BFBG reserves the right to make reasonable amendments to such stale return policy from time to time as required by changing technology or competitive

circumstances in the industry or a market."). In 2011, Bimbo amended the policy to require distributors to sort and organize stale or damaged products that they are returning for credit. R. 76-3, Def.'s Exh. C, Return Policy at BFBD000144. Bimbo's regional sales manager sent a letter to explain the new policy, stating that "losses that we incur under the current system where returns are not verified are not sustainable." R. 94-4, Def.'s Exh. D, Hall Letter at SB000082. The letter also notes that "[t]he new policy is in line with the policies that are currently in successful use in many other BFBD regions and markets across the country with a proven track record." *Id.* Bell estimates that because of the amended policy he spends an extra forty minutes per day sorting returned stale products. PSOF ¶ 21. In the end, this totals an annual value of lost work time of roughly $5,000. *Id.*

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary-judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v.*

*Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Illinois Wage Payment and Collection Act (Count Two)

Bell's sole claim under the IWPCA is for deductions from his settlement account related to expenses for his handheld computer equipment. PSOF ¶ 1; R. 78, Pl.'s Resp. Br. at 2. The IWPCA states that "deductions by employers from wages or final compensation are prohibited unless such deductions are . . . to the benefit of the employee [or] made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Bimbo challenges Bell's IWPCA claim under each of the Act's three requirements.

First, Bimbo argues that Bell is not entitled to "wages" as defined by the Act. The IWPCA defines "wages" as "any compensation *owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation.*" 820 ILCS 115/2 (emphasis added). The statute does not define "compensation," but the Seventh Circuit has defined the term as "'payment for value received or service

7

rendered.'" *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 706 (7th Cir. 2001) (quoting Webster's Third New International Dictionary 463 (1981)).

Curiously, despite the statute's plain language, Bimbo provides no analysis of whether Bell qualifies as an "employee." *See* R. 75, Def.'s Br. at 1 n.2 (reserving the right to advance arguments about whether Bell is an "employee" for a later motion or at trial). Instead, Bimbo argues that Bell conceded that he had no agreement with Bimbo entitling him to wages, regardless of his employee status. R. 93, Def.'s Reply Br. at 4 n.5, 5. First, Bimbo points to Bell's testimony that Bimbo never promised him that he "'would be paid . . . salary or other wages.'" Def.'s Br. at 3 (quoting DSOF ¶ 18). Instead, Bell agreed that he only earns a profit off his sales: Bell "buy[s] products at one price, [he] sells them to a customer at a higher price, and [he] makes money on the difference." *Id.* at 4 (alterations in original) (quoting DSOF ¶ 18). Bimbo also asserts—but without analysis—that Bell's distributor agreement is not an "employment contract or agreement," as required under the IWPCA, because it instead created an "independent contractor relationship." Def.'s Br. at 4; *see also* Distrib. Agreement § 6.2..

But Bell's deposition testimony does not establish a legal conclusion that his payments from Bimbo are not "wages." And under Illinois law, Bell need only demonstrate that he had an "agreement" with Bell that it would pay him compensation. *See Zabinksy v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. Ct. App. 2004) (recognizing that the term "agreement" in the IWPCA is "broader than a contract and requires only a manifestation of mutual assent on the part of two or more

8

persons"); *see also Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (citing *Zabinsky*). As Bell points out, under his distributor agreement, Bimbo has agreed to pay Bell the amount remaining in his settlement account after Bimbo credits Bell for the charge slips that Bimbo purchases. *See* Pl.'s Resp. Br. at 3; *see also* Distrib. Agreement §§ 8.1-.2. But absent additional factual analysis about Bell's *employment* status, the Court is not able to conclusively determine whether these agreed payments represent mere "profit" or instead qualify as "wages." If Bell is an independent contractor, these payments look like profit; but if he is an employee, they look more like a commission, which are wages under the IWPCA. *See* 820 ILCS 115/2. Bell's concessions are certainly relevant, but there is too much factual uncertainty at this stage of the litigation to grant summary judgment on the "wages" issue alone.

On the one hand, Bell concedes that he personally owns the products he buys from Bimbo until he sells them to a customer. R. 94-1, Bell Dep. at 78. And Bell admits that a few of his customers pay him directly for the products. *Id.* at 352-53, 405. Moreover, Bimbo does not require Bell to return stale products to the company; Bell could instead take these products home with him or sell them to farmers to use as livestock feed. *See* DSOF ¶ 21; R. 76-1, Def.'s Exh. A, Bell Dep. at 205. On the other hand, there are also facts that suggest that Bell is really a delivery worker for Bimbo. For one, there is no evidence that Bell is able to negotiate the quantity of his customers' orders. Instead, under his distributor agreement, Bell is required to buy and accept quantities sufficient to meet his customers' demands. Distrib. Agreement § 3.2. And because 95% or more of Bell's customers are chain stores, almost all purchasing

decisions are made through Bimbo's central office, without Bell's direct input. *See id.* § 7.1; Bell Decl. ¶ 6; *see also* R. 82-1, Bell Dep. at 76 ("The distributor has nothing to do with what goes on sale, when it goes on sale. . . . [Distributors] just really deliver and stock the shelves."). Finally, Bell's distributor agreement does not allow him to negotiate the price at which *he* purchases products from Bimbo. *See* Distrib. Agreement § 3.3 ("Products will be sold to [Bell] on reasonable terms and prices as established by BFBG from time to time."). In the end, the Court must view the facts and draw reasonable inferences in the light most favorable to Bell. *See Scott*, 550 U.S. at 378. Therefore, absent additional factual analysis, which Bimbo did not offer, the Court cannot conclude that Bimbo's payments to Bell just represent profits to an independent contractor rather than compensation to an employee.

But even if Bell is entitled to wages, Bimbo argues that the deductions were not only for Bell's benefit, but also that Bell authorized the deductions. *See* Def.'s Br. at 5-7; Def.'s Reply Br. at 6-8. On these two points, the Court agrees with Bimbo. First, these deductions benefitted Bell because they were convenient: they saved him from having to pay Bimbo out-of-pocket for these expenses. Bell disagrees, arguing that the expense of buying and maintaining the equipment was not for his benefit because Bimbo required him to use this equipment. Pl.'s Resp. Br. at 6. But that argument misses the point. It is not the *expense* that must be for his benefit, but the *deduction* itself. *See* 820 ILCS 115/9 ("[D]eductions by employers from wages or final compensation are prohibited unless *such deductions* are . . . to the benefit of the employee." (emphasis added)). And here, the settlement-account deductions are a

convenience that benefits Bell. *Cf.* R. 76-1, Bell Dep. at 108 (Bell's agreeing that having Bimbo make loan payments to a third-party lender directly from his settlement account is more convenient for him).

What's more, Bell authorized these deductions. In September 2000, Bell signed a document authorizing Bimbo's predecessor to make weekly deductions of $56.88 for computer-related costs, including for paper and supplies, maintenance, and a home polling charge. Assignment of Receivables at BFBD000065. The document clearly stated that "[t]his assignment shall continue until revoked in writing by [Bell]." *Id.* And Bell admitted that he has never expressed an interest in revoking the agreement. DSOF ¶ 47; *cf. Kim v. Citigroup, Inc.*, 856 N.E.2d 639, 641-42, 646 (Ill. App. Ct. 2006) (finding that deductions made in 2000 were permitted under the IWPCA based on an agreement the plaintiff signed in 1997).

The year-end summaries that Bimbo provided Bell account for these deductions. *See* Pl.'s Exh. 2 (documenting deductions for "Handheld Maintenance," "Handheld Supplies," "Communication Charge," and "Norand Paper & Ribbons"). Bell believes that Bimbo violated the IWPCA because Bimbo deducted varying amounts and modified or renamed the subcategories for the deductions without seeking new authorization from Bell. Pl.'s Resp. Br. at 6. But Bell admits that the average weekly deductions[4] never exceeded the total authorized amount ($56.88). *See* PSOF ¶ 4.

---

[4]The year-end summaries only include the total annual deductions for each category; they do not provide weekly breakdowns. *See* Pl.'s Exh. 2. Based on the Court's review of the summaries, Bell seems to have calculated "averages" from this data by adding up the total annual deductions for the three computer-related categories and then dividing by 52. *See* PSOF

Moreover, the average weekly deductions never exceeded $17.50, the total weekly amount designated in the 2000 authorization for supplies, maintenance, and communication fees. *See id.* ¶ 4. Therefore, because Bell's 2000 authorization was still in place and because the deductions did not exceed the authorized amount, these deductions were permitted under the IWPCA.

Even assuming for purposes of summary judgment that Bell is an employee entitled to wages, the deductions that Bimbo made from Bell's settlement account were both for his benefit and authorized by Bell. The Court therefore grants summary judgment to Bimbo on the IWPCA claim.

## B. Breach-of-Contract Claims (Count Six)

### 1. Pricing and Promotions

Bell's first breach-of-contract theory challenges Bimbo's pricing and promotions practices. *See id.* ¶¶ 7-14. The Court has already explained that Bell failed to timely put Bimbo on notice of this contract claim. *See* R. 101-1, 7/25/12 Minute Entry. First, Bell's Amended Complaint did not provide adequate notice. Although the incorporated paragraphs under Bell's breach-of-contract claim (Count 6) flag this theory, these allegations are simply not specific enough to have alerted Bimbo that Bell was pursuing damages based on those specific theories. *See* Am. Compl. ¶ 82 (incorporating various subsections of ¶ 30). What's more, Bell's (a)(1) disclosures did not mention this pricing and promotions theory, *see* R. 94-2 at 3, despite the requirement that those

¶ 4.

disclosures include a "computation of each category of damages," Fed. R. Civ. P. 26(a)(1)(A)(iii). Bell's amended interrogatory answers from March 2012 were equally vague. *See* R. 94-3 at 17. Finally, in his deposition testimony, Bell only identified two breach-of-contract theories: his right to distribute Sara Lee bread products and the amended stale return policy. *See* R. 76-1, Bell Dep. at 240-41.

It was not until June 15, 2012, only one month before class discovery closed and after Bimbo had filed its opening summary-judgment brief, that Bell alerted Bimbo that he was claiming contract damages under this third pricing and promotions theory. *See* R. 82-5, Pl.'s Exh. 4, Pl.'s Supp. & Am. Answer Interrog. No. 16 at 5-7. Because this theory was within Bell's personal knowledge, he should have asserted this additional contract claim at the start of the case. But Bell failed to do so. Indeed, the Court has already denied Bell's motion for leave to file a Second Amended Complaint that explicitly tries to plead a pricing and promotions claim. *See* R. 135, 9/27/12 Minute Entry. So Bell may not now attempt to make a back-door amendment to his complaint by asserting facts that support that new claim in his Rule 56.1 statement. *Cf. Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (internal quotation marks and citation omitted)). Because Bell did not adequately allege this claim at the right time in the litigation, the Court will not consider it now.[5]

---

[5]Even if Bell had timely asserted this pricing and promotions theory, the summary-judgment record suggests that it has little merit. To start, Bell explicitly designated Bimbo to

## 2. Sara Lee Distribution

Bell's second breach-of-contract claim challenges Bimbo's denying him the exclusive right to sell and distribute Sara Lee bread products in his sales area. *See* PSOF ¶ 33. To establish a breach of contract under Illinois law,[6] a party must show: "(1) that a valid and enforceable contract existed, (2) that the plaintiff performed on the contract, (3) that the defendant breached it, and (4) that the plaintiff was injured." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 683 (7th Cir. 2013); *see also Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 754 (Ill. App. Ct. 2013). Bell argues that he is entitled to distribute Sara Lee bread products under the terms of his 1995 distributor agreement, which defines "Products" as broadly including "similar third party products

---

negotiate with chain stores on his behalf in his distributor agreement. *See* Distrib. Agreement § 7.1("[Bell] has requested BFBG to negotiate and solicit business for him from such Chains."). And contrary to Bell's declaration that Bimbo has never allowed him to participate in any discussions about pricing and promotions for chain stores, *see* Bell Decl. ¶ 7, Bell testified in his deposition that he has attended meetings at Bimbo to discuss these policies, *see* R. 82-1, Bell Dep. at 355; R. 94-1, Bell Dep. at 264-65, 273. Bell fleshes out his arguments for his pricing and promotions claim in his class-certification brief. *See* Pl.'s Class Cert. Br. at 4-9. But because those arguments came too late in the game, the Court will not more fully analyze the merits of those arguments now for purposes of resolving the summary-judgment motion.

[6]As discussed in the Court's earlier opinion, *see* R. 91 at 4, Bell's distributor agreement specifies that New Jersey law will control contract "validity, interpretation and performance." Distrib. Agreement § 15.5. Yet both parties have cited only Illinois law and federal court cases applying Illinois law. The Court will therefore continue to abide by the parties' implicit agreement to apply Illinois law. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) (applying Illinois law despite a contract provision specifying Texas law, when the parties briefed and cited Illinois law and did not request that another state's law should apply).

marketed or distributed by BFBG." *See* Pl.'s Resp. Br. at 11 (quoting Distrib. Agreement § 1.2).[7]

But in 2010, Bell signed an amendment to his 1995 agreement that changed the definition of "Products." The amendment defines "Products" as "all fresh baked breads, rolls, cakes muffins, tortillas, and similar fresh baked products intended to be sold as fresh, and sold under the following names and trademarks: Arnold[,] Brownberry[,] Bimbo[,] . . . and all private label products manufactured specifically for Outlets by BFBD." Am. Distrib. Agreement at BFBD000049. The amendment then clarifies that **"Products do not include:** (a) Products distributed by BFBD or its affiliates under any trademarks other than those listed above." *Id.* In other words, under the plain language of the 2010 amendment, Bell has no contractual right to distribute Sara Lee products. His breach-of-contract claim therefore must fail because there is no breach.

In response to the plain language of the 2010 amendment, Bell alleges that the amendment is voidable for fraudulent inducement. *See* Pl.'s Resp. Br. at 12-13. He

---

[7]Bell also tries to draw a distinction between "products" and "brands," arguing that Sara Lee is only a brand and that Bell would therefore still be entitled to distribute Sara Lee-branded products that fall within the "products" definition in his 1995 distributor agreement. *See* Pl.'s Resp. Br. at 12. In support of this argument, Bell attaches several Internet print-outs to his Rule 56.1 statement. *See* R. 82-7, Pl.'s Exh. 6. Ultimately, as will be discussed later, these print-outs are irrelevant because the 2010 amendment that Bell signed changed the "Products" definition governing his relationship with Bimbo. But if the Court had to parse the "Products" definition in the 1995 agreement, the Court would not consider these print-outs because these documents are not authenticated, as Bimbo points out. *See* Def.'s Reply Br. at 10 (citing *Article II Gun Shop, Inc. V. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." (internal quotation marks and citation omitted))). Moreover, as far as the Court can tell, Bell also failed to offer these print-outs in discovery.

claims that at the time he signed the amendment he believed that he was splitting his route in exchange for the right to sell Bimbo-branded baked goods. *See id*. at 12; PSOF ¶ 37. He also alleges that he felt pressured to sign the amendment. *See* PSOF ¶ 40; *see also* Bell Decl. ¶ 8. But like the pricing and promotions claim, Bell did not alert Bimbo that he would pursue an alternate theory of fraudulent inducement in either his Amended Complaint or his sworn testimony. *See* Def.'s Reply Br. at 11 n.8. Because Bell did not assert this theory of liability—essentially, a new claim—until his opposition to summary judgment, this untimely claim cannot be raised now. *See Anderson*, 699 F.3d at 997. Therefore, because the 2010 amendment clearly denies Bell the right to distribute Sara Lee products, his second breach-of-contract claim must also fail.

### 3. Amended Stale Return Policy

Bell's final breach-of-contract claim—that Bimbo's 2011 amendment to its stale return policy breaches his distributor agreement—also fails. Bell's distributor agreement recognizes not only that Bimbo has a stale return policy, but also that Bimbo may amend that policy so long as the amendment is reasonable. Distrib. Agreement § 3.4 ("BFBG reserves the right to make reasonable amendments to such stale return policy from time to time as required by changing technology or competitive circumstances in the industry or a market."). In line with this provision, Bimbo amended its return policy in 2011 by requiring distributors to "organize and sort [their] product returns to follow the specific item order listed on the returns transfer report." Return Policy at BFBD000144 (emphasis omitted).

Bell claims that this amendment is unreasonable. *See* Pl.'s Resp. Br. at 14; *see also* R. 76-1, Bell Dep. at 242-43. Although Bell agrees that it is reasonable for Bimbo to audit and count returned products, he believes that he should not be the one doing the sorting. *See* R. 76-1, Bell Dep. at 244. Sorting returned products has added extra work time to Bell's day. *Id.* at 242. He estimates that he now spends an extra forty minutes per day sorting returned stale products. PSOF ¶ 21. According to Bell, this totals an annual value of lost work time of roughly $5,000. *Id.* But a trier of fact could not find that the sorting requirement is unreasonable: Bell himself concedes that when he delivers products to his customers, he sorts the products so that the customers can readily verify how much of each product they are getting. *See* R. 76-1, Bell Dep. at 243-44. Bimbo's return-policy amendment requires Bell to do the same thing for the same purpose, just on the return-side of the process. The only specific grounds that Bell offers for labeling the sorting requirement as unreasonable are that it takes him more time and that Bimbo has union warehouse workers who could do the sorting. *Id.* at 244. But nothing in the distributor agreement bars amendments to the return policy that would require Bell to expend more time or that would require labor that Bimbo workers could themselves do. To be sure, it is theoretically possible that an amendment could so greatly impose costs on Bell so as to make returns infeasible. But here Bell estimates that the amendment consumes only $5,000 in lost work time, compared to his annual profit margin of nearly $75,000 (after all expenses are paid). DSOF ¶ 40. And remember that Bell acknowledges the reasonableness of Bimbo wanting to audit

and to count the returned product. In other words, there is a legitimate reason for the amendment, and no reasonable jury could find otherwise.

Bell also argues that Bimbo has provided no evidence that either changing technology or competitive circumstances in the industry or a market—the two grounds listed in the distributor agreement for amending the policy—prompted this amendment. Pl.'s Resp. Br. at 14. That is simply not true. In a letter that Bell himself produced in discovery, one of Bimbo's regional sales managers explained the rationale for the amended return policy: "Product accountability and thrift recovery are critical to the profitability of all of our businesses and it is imperative that we work together to control them. The losses that we incur under the current system where returns are not verified are not sustainable." Hall Letter at SB000082. The letter also notes that "[t]he new policy is in line with the policies that are currently in successful use in many other BFBD regions and markets across the country with a proven track record." *Id.* Because Bimbo adequately articulated a reason for the amendment that was in line with the terms of Bell's distributor agreement, summary judgment is granted on this final contract theory as well.

In sum, the Court grants summary judgment on both of Bell's remaining counts: his IWCPA claim (Count Two) and the two breach-of-contract claims that Bell did not waive (Count Six).

### IV. Class Certification

Even if the Court were wrong to grant summary judgment in this case, the Court would still deny Bell's motion for class certification. If Bell appeals from the

summary-judgment ruling, explaining these alternative grounds for decision will permit the parties to present all of the disputes on appeal and give the Seventh Circuit the choice to decide, if it wishes, all of the issues in one appeal.

## A. Rule 23 Requirements

To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one of the subsections of Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "Failure to meet any of the Rule's requirements precludes class certification." *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009) (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)) (internal quotation marks omitted).

"A class may be certified only if 'the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied.'" *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 916 (7th Cir. 2011) (emphasis in original) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)) . The named plaintiff bears the burden of showing that each requirement is satisfied. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)); *see also Dukes*, 131 S. Ct. at 2551

(recognizing that class-certification analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim"). In the end, the Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (internal quotation marks and citation omitted).

### B. Class Claims

Bell moves the Court to certify two classes, as well as two additional subclasses. For the IWPCA claim, Bell seeks to certify a class defined as:

> All individuals who, through a contract or agreement with Defendant or otherwise, sold or distributed Defendant's bakery products within the state of Illinois, who are or were classified by Defendant as independent operators/independent contractors, and who had unauthorized deductions taken from their weekly settlement for various handheld computer-related expenses at any time from May 18, 2001 to the present.

Pl.'s Class Cert. Br. at 2. For his breach-of-contract claim, Bell proposes one class and two subclasses. Bell defines the breach-of-contract class as:

> All individuals who, through a contract or agreement with Defendant or otherwise, sold or distributed Defendant's bakery products within the state of Illinois, and who are or were classified by Defendant as independent operators/independent contractors, at any time from March 1, 2007 to the present.

*Id.* at 1. Bell also requests a subclass of distributors who were subject to specific requirements for sales to Jewel stores and a separate subclass for distributors that had to follow Bimbo's amended stale return policy. *See id.* at 2 (proposing definitions for both subclasses).

The proposed class's IWPCA claim is identical to the claim that the Court dismissed on summary judgment. *See id.* at 10. The amended stale return policy claim is also virtually the same, except that Bell now challenges the policy as it was amended in 2009, rather than the 2011 amendment that the parties debated on summary judgment. *See id.* at 9-10. The 2009 policy, which is similar to the later amendment, requires that "[a]ll returns . . . be sorted by item for check in with the depot clerk (or sales manager) on duty." R. 118-11, Pl.'s Exh. N at SB000097. Likewise, the letter explaining the policy change also connects the 2009 amendment to competition and market pressures. *See id.* at SB000095.

The theories supporting the proposed class's breach-of-contract claims, however, are somewhat different from the pricing and promotions claim that Bell articulated earlier in his opposition to summary judgment. In his class-certification motion, Bell now explains that the pricing and promotions class claim is based on: (1) Bimbo's failure to seek meaningful input from distributors when negotiating with chain stores, (2) Bimbo's failure to provide adequate information to distributors so that they can evaluate whether Bimbo is acting in their best interest, and (3) Bimbo's failure to provide recourse to distributors if Bimbo does not act in their best interest. Pl.'s Class Cert. Br. at 7. Bell also now places the Sara Lee claim under this broader pricing and promotions umbrella. *See id.* at 6-7. But instead of focusing on Bimbo's refusal to allow distributors to sell Sara Lee, Bell now focuses only on Bimbo's practice of competing with its distributors by promoting Sara Lee products in distributors' sales areas. *Id.* Next, Bell's other pricing and promotion theories—that Bimbo requires distributors to

sell products at promotional prices before a promotion has begun and that it also requires distributors to give wholesale credit to a store for returned stale product when the distributor originally sold the product at a promotional price—are the bases for the Jewell subclass's claim. *See id.* at 7-9. Finally, Bell also challenges Bimbo's "Everyday Low Cost" policy, under which distributors are always required to sell products to Jewel at a discounted price, regardless of whether a promotion is being offered. *See id.* at 8-9.[8]

## C. Commonality and Predominance

Regardless of how Bell frames the proposed class claims, each of these classes and subclasses are not suitable for certification for the same reason: they fail to satisfy the commonality and predominance requirements of Rule 23. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To establish commonality, the class representative must demonstrate that members of the class "have suffered the same injury." *Dukes*, 131 S. Ct. at 2556. Commonality requires that all of the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. In *Dukes*, the Supreme Court concluded that what is most

---

[8]As discussed earlier, the Court need not comment on the merits of these refined pricing and promotions claims because Bell did not timely raise them. Bell's failure to timely plead these claims also provides an alternative basis for denying his certification motion. *Cf. Anderson v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 525, 529 (5th Cir. 2008) ("The district court's authority to certify a class under Rule 23 does not permit it to structure a class around claims not pled.").

relevant to class certification "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (internal quotation marks and citation omitted).

While similar to commonality, "the predominance criterion is far more demanding." *Messner*, 669 F.3d at 814 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." The Court thus must compare the role of common issues of law and fact with the role of individual issues, including whether the Court must examine individual transactions in adjudicating the claim. *See Messner*, 669 F.3d at 815; *see also Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 738 (7th Cir. 2011).

Here, the individualized details of each distributor agreement prevent Bell from establishing commonality and predominance. At the time Bell filed this lawsuit in May 2011, the record shows that Bimbo had agreements with 139 distributors in Illinois that worked out of 22 different depots. *See* R. 118-6, Pl.'s Exh. I at 8. But Bell has provided no evidence demonstrating how many iterations of the distributor agreement there are out of the 139 proposed class members. Most importantly, Bell has failed to meet his burden of showing that a substantial number of distributors have the same agreement. This defect is fatal for all of Bell's proposed class claims. *Cf. Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th

Cir. 2010) ("[C]laims for breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contracts."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (finding that the commonality requirement was not met because there was "materially different contract language" in multiple franchise agreements).

In reply, Bell argues that the relevant provisions in the various distributor agreements are "substantially the same." Pl.'s Class Cert. Br. at 4. He even suggests that Bimbo uses a form contract with its distributors. *See* R. 139, Pl.'s Class Cert. Reply Br. at 1. The distributor agreements in the record, however, readily demonstrate that these agreements are not form contracts, and they belie any argument that their substantive differences are immaterial. *See* R. 105-1, Pl.'s Summ. Exh. 1 (comparing the provisions of four different distributor agreements).

Starting first with the pricing and promotions claim, the Court would have to analyze the precise language of each distributor agreement to determine whether there was a breach. For example, there are materially different terms governing Bimbo's negotiations with chain stores. *Compare* Distrib. Agreement § 7.1 ("BFBG hereby agrees to so act on [Bell's] behalf in this regard and to use its best efforts to obtain from such Chains authorization to sell Products to the Chains on uniform terms and prices at which the Chains would be willing to purchase Products for its Outlets, and to communicate the information concerning such authorization and terms to [Bell]."), *with* R. 118-5, Pl.'s Exh. H § 5.2 ("GWBD shall use commercially reasonable efforts to

24

obtain from chains authorization to sell products in the chains and information regarding the prices and terms at which the chains would be willing to purchase products for their Outlets . . . ."). And while Bell cannot negotiate with chains stores under his distributor agreement, other distributors' agreements do *not* foreclose direct negotiations between distributors and chain stores. *Compare* Distrib. Agreement § 7.1 ("[I]mportant Chains in [Bell's] Sales Area . . . will not negotiate with individual Distributors . . . ."), *with* Pl.'s Exh. H § 5.2 ("This appointment of GWBD and its affiliates as Distributor's agent shall not prevent Distributor from having the right to negotiate prices and terms directly with a chain and selling products to the chain at whatever prices and terms Distributor can negotiate."). These are examples from just two distributor agreements. The Court would have to similarly compare and analyze the terms of each distributor agreement to determine whether each distributor had established that Bimbo breached a particular agreement. Because of this individualized analysis, Bell has failed to satisfy the commonality and predominance requirements.

The same is true for Bell's claim challenging the amended stale return policy. Bell's distributor agreement limits amendments to the stale return policy to those "required by changing technology or competitive circumstances in the industry or a market." Distrib. Agreement § 3.4. Other agreements, however, give Bimbo open-ended discretion "to make reasonable amendments . . . from time to time." Pl.'s Exh. H § 3.2. Determining whether there is a breach will require comparing the amended policy to

the varying language in each individual distributor agreement.[9] This individualized

analysis again defeats commonality and predominance.

Finally, the IWPCA claim meets the same fate. The different language in each

distributor agreement would result in a highly individualized analysis of whether there

is an employee-employer relationship. What's more, the IWCPA's independent-

contractor exemption requires an individualized analysis of three separate elements

that go beyond the scope of the agreement itself. *See* 820 ILCS 115/2; *see also Adams*

*v. Catrambone*, 359 F.3d 858, 865 (7th Cir. 2004). Adding individualized contract

analysis on top of a test that is already multi-factored necessarily forecloses Bell from

satisfying the commonality and predominance requirements for the IWPCA claim as

well.

All in all, the variation in contract language demonstrates that class certification

is not appropriate. Despite making a long list of common questions, Bell cannot satisfy

the commonality requirement because the dissimilarities in the proposed class's

distributor agreements have the potential to impede the generation of common

---

[9]On a related point, Bell challenges the admissibility of a declaration from Joseph Schuch that contradicts Schuch's deposition testimony. *See* Pl.'s Class Cert. Reply Br. at 13. In his deposition, Schuch testified that distributors are required to sort their returns under the amended return policy that is in place at all Chicago area depots. *See* R. 146-1, Def.'s Exh. 1, Schuch Dep. at 212, 214. In his declaration, however, Schuch states that there are two additional policies, neither of which he discussed or revealed during his deposition. *See* R. 136-13, Pl.'s Exh. M, Schuch Decl. ¶¶ 3-4. Schuch also states that some Bimbo representatives do not enforce the amended policy, even if it applies at that depot. *Id.* ¶ 5. Because the Court agrees that Schuch's declaration is inconsistent with his deposition testimony, it does not consider the declaration in ruling on Bell's certification motion. *See Fisher v. Avanade, Inc.*, 519 F.3d 393, 406 (7th Cir. 2008). But even assuming there is only one amended return policy in effect in the Chicago area, Bell cannot establish commonality and predominance because the Court would still have to compare that one policy to each and every distributor agreement.

answers. *See Dukes*, 131 S. Ct. at 2551. Moreover, individualized analysis of each contract would overwhelm any common questions of law or fact. If the summary-judgment motion had been denied, the Court would have denied Bell's motion for class certification on those grounds.

## V. Conclusion

For the reasons stated above, Bimbo's summary-judgment motion [R. 74] is granted, and Bell's class-certification motion [R. 104] is denied. Because no other motions or claims remain pending before this Court, judgment is entered for Bimbo and against Bell.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: December 3, 2013